(13 Misc. Rep. 158.)

McFADDEN v. CAMPBELL et al.

(Common Pleas of New York City and County, General Term. June 3, 1895.)

1. NEGLIGENCE—EVIDENCE.
In an action for injuries received by plaintiff while working in defendant's warehouse, by the fall of a bale of rope, it appeared that plaintiff and other workmen were engaged in removing goods from the warehouse near the tier of rope from which the bale fell. The witnesses for both parties testified that, in tiering goods, no tier of goods should be supported by an adjacent tier. Plaintiff gave evidence that the bales of rope were not tiered properly. Plaintiff had been working in the place where he was injured the greater part of the forenoon. The bail by which he was injured fell from the top of the tier, and was the only one that fell. *Held*, that the evidence did not warrant a finding that the accident was caused by the improper mode of tiering the bales of rope.

2. SAME—FACTS CONSISTENT WITH ABSENCE OF NEGLIGENCE.
Where the facts proved are equally consistent with the absence as with the existence of negligence, the question should not be submitted to the jury.

Appeal from trial term.

Action by Samuel McFadden against Herbert P. Campbell and others to recover for injuries alleged to have been sustained by plain-

tiff in consequence of defendants' negligence in selecting and retaining in their employment an incompetent fellow servant. From a judgment entered on a verdict in favor of plaintiff, and from an order denying a motion for a new trial, defendants appeal. Reversed.

Argued before BOOKSTAVER, BISCHOFF, and GIEGERICH, JJ.

Thomas S. Moore, for appellants.
Robert C. Taylor, for respondent.

GIEGERICH, J. The defendants, at the time when the accident happened to the plaintiff, viz. on or about the 21st day of December, 1891, were engaged in the storage business at various places in the city of New York. Among their warehouses was one covering the block bounded by Twelfth street, Thirteenth avenue, Bethune and West streets, divided into eight stores, lettered from A to H, in which were stored various kinds of merchandise, piled in tiers nearly to the ceiling of the several floors. Plaintiff had then been in their employ about a year. He at first was employed as an ordinary laborer, and subsequently, and about Thanksgiving Day, he succeeded one Miller as foreman of store H, the duties of which position were to superintend the receipt and delivery of goods, wares, and merchandise, and the storage thereof, at said warehouse. Before entering the defendants' employ, plaintiff had been employed in a grocery house, which, he testified, "is just about the same thing as a storehouse," for 12 years. He had been employed in storage warehouses about two years, and was "familiar with the various modes of storing goods; familiar with stevedores' work generally." The complaint charges that, previous to plaintiff's employment as such foreman, said Miller had been employed by defendants to perform similar services; that said Miller was incompetent to perform the services for which he had been employed; that his said incompetency was known to the defendants, and that they had notice thereof; that, previous to plaintiff's employment as such foreman, the defendants received at said warehouse a large number of bales of rope, which they negligently caused to be stored therein by or under the direction of said Miller; that while plaintiff was superintending the delivery of certain bales of goatskins, which were stored near and adjoining the place where said bales of rope had been stored, one of the bales of rope fell upon him, thereby severely injuring him. And the complaint further charges that "the place where the said plaintiff was so working was rendered unsafe, and that the unsafeness thereof might, by the exercise of care and inspection, have become known to defendants, but no inspection thereof was made, or caused to be made, by said defendants."

Now, the very first question to be determined upon this appeal is whether any evidence was adduced upon the trial which tends to show that the accident was due to the manner in which the bales of rope were stored; for, if there was not, it is apparent that there is no necessity for considering the other questions raised upon the argument of this appeal. Both plaintiff and defendants' witnesses

testified that in tiering goods each lot should stand on its own bottom, and not receive support from the adjacent goods; this precaution being deemed necessary in order that one lot of goods might be removed without depriving others of support, and causing their fall. The manner in which the rope was stored was described by one Michael Divver, a laborer, who assisted in tiering the bales, as follows:

· "The goatskins were in place before the rope was tiered, and alongside the goatskins there was an open space, in which the rope was put. The rope was tiered as follows: Certain tiers of it were first piled, fore and aft, up against the wall of the building. This left a little space in between these bales and goatskins,—just enough for a single side tier of rope to be run in. * * * The truck was run in with the bale of rope, and was just emptied into this space. As we got higher, and other bales of rope were brought in, tipped, and dumped in to fill up the space. There was a single side tier of bales rolled on top of that, filling up the space between the goatskins and the rope."

From the testimony of the plaintiff, it appears that the goatskins were about 5 feet high, 3 to 4 feet thick, and 4 feet wide, and that the bales of rope were in burlap, bound with rope, and were about 6 feet high, 4 feet wide, and $2\frac{1}{2}$ feet in thickness, and stood on end, and that the bales of the latter were not straight, and were in a kind of old straw bagging, "the whole of them piled together. It was impossible to give them the right pitch unless they were leaned in against the wall or something." Plaintiff further testified as follows:

"Q. Then, did I understand you to say that such rope only are safely tiered up,—is when it leaned against something? A. Yes, sir; leaned against the wall. Q. Was it proper tiering to tier the rope of that character so that it leaned against the next goods? A. No, sir; that was a poor way. Q. Tell the jury just how that rope ought to be tiered, in a place like that? A. (Witness illustrates with the model.) The rope was very soft and heavy,—I should judge, weighed 1,200 pounds to the bale. It would not stand up straight, of itself. You might take two of them, and let them run that way (indicates). When you commence to put them up to the wall, you don't go close to the wall, but come out, and the next bale goes over. Q. You put the layers only out a little, and then give them the pitch to the wall? A. Yes, sir. Q. Would it be a proper way to store rope,—such a kind of rope,—in such a place, to have the side tier alongside the rope piled in the way you have indicated? A. No, sir; the proper way would be to put the side tier in between two. * * * Q. Could rope be piled that way safely,—such tiering that way? A. The way Divver testified? Q. Yes, sir. A. No, sir; it would not be proper to pile it that way. It wouldn't be safe."

At the time when the accident occurred, plaintiff was engaged in superintending the delivery of 116 goatskins. These adjoined, in part, the bales of rope, which were to the north thereof. Such bales of rope and goatskins bordered on a gangway about six feet wide. Plaintiff testified that, with the assistance of eight men, he began work at the gangway, and took away bales of goatskins that were in front of the side tier, which was only the size of the end of the bales; that the matting which covered the goatskins had marks thereon which were not clear and distinct, and some difficulty was experienced in finding, from a large number of goatskins, the particular bales numbered in the order which plaintiff was filling. Plaintiff further testified:

"I shipped and walked around wherever I saw the needed one. There was the porter down stairs, from the store the goatskins belonged to, and he stood

there, and if I saw one he would say, 'Stop; here is one.' Then we did not begin again at the tier to the left, to take away the skins. We might find about 15 of them. We may have worked towards the wall. I should say, we went 10 feet of it. I won't say, as a matter of fact, we went to the wall. I won't be positive. In this sort of hallway we went in an irregular space of 10 or 15 feet. I should judge I was about 12 or 15 feet from the gangway when I was hurt. It was about 20 feet from the gangway to the wall. I was in there about 8 or 10 feet when it happened. * * * I suppose we moved easily 80 bales. I would go in and find the bale, and see it was not the right number, and take it and turn it to one side. I was making search for these bales."

John Clarke was substantially the only witness who saw the accident, and his version thereof, as testified by him, was as follows:

"I was away from him [plaintiff], when he was hurt, about as far as you are from me; that is, I was working there breaking out goatskins. Q. Tell us how he was hurt, and what did you see? A. A bale of rope. Q. What did the bale do? A. His back was towards the bales, and the bale rolled down, and struck him on the shoulders, and knocked him down. Q. Where did the bale come from? A. Came from the tier of rope. Q. What tier was it? A. The side tier. * * * Q. Did you see when it rolled down upon him? A. Yes, sir. Q. How high was it before it rolled down? A. About five feet high, or six; about six feet, I guess. Q. What was it held it up before it rolled down? A. I don't know. I worked in there the same time, back and forth, and rolling out those bags. Q. In the same place? A. In the same place; yes, sir. Q. It did not fall until this particular time? A. No, sir. Q. Was it clear there, or any support to it, up to that time? A. Yes. Q. No support? A. No support. I had taken goatskins away from that place. We had taken goatskins away from that place. Those goatskins that I took away were next to the pile of rope. I removed those goatskins. That left a clear space there. I was in there myself, back and forth. This clear space was there before this bale fell. It might be 20 or 30 minutes,—half an hour or more."

It thus appears from the plaintiff's evidence that the bales of rope stood for the length of time stated by the last witness after the goatskins were removed. For some unexplained reason, the top bale—not the whole tier—fell off and struck the plaintiff. The outside tier having thus stood the length of time mentioned, can it fairly be deduced from the evidence that the solitary bale fell in consequence of the manner in which it was tiered? The evidence, in my opinion, does not warrant the drawing of such an inference. On the contrary, the only conclusion which, to my mind, can be drawn legitimately from the evidence, is that the bale was dislodged from its resting place in the tier by the pulling about of bales of goatskins by laborers who worked under plaintiff's direction, and by their jostling one another in the dark, caused partly by their eagerness to finish their job, which they were encouraged to do by the words of the plaintiff: "Come, boys, make a move with these. It is getting 12 o'clock, and we'll get these down before dinner." I am confirmed in these views by the testimony of the plaintiff, who, after testifying to having made search for the bales of goatskins, testified as follows:

"Q. Did you watch to see that the goods were all stowed nicely at the time? Did you look at it, up alongside of you, to see how they were? A. I looked up in front; yes, sir; and with the lantern. My mind was on the getting out of the 116 odd numbers of the goatskins. Q. You did not care for anything else? A. How do you mean? Q. You did not pay any attention to them? A. I was paying attention to these men. These men were turning out the 116 bales of them skins."

But conceding, without so holding, that such conclusion cannot be drawn from the evidence, still, as plaintiff's evidence, at most, shows that it is equally consistent with the absence as with the existence of negligence of the defendant, there has been a failure of proof. Hence it was error to leave the case to the jury. Baulic v. Railroad Co., 59 N. Y. 356, 366. The case of Guliano v. Whitenack, 9 Misc. Rep. 8, 29 N. Y. Supp. 20, cited by respondent's counsel, is not at variance with these views, as in the present case there is not, in my opinion, room for rational doubt either as to the circumstances proved, or as to the conclusions of fact which may properly be drawn from them. Willis v. Railroad Co., 34 N. Y. 679. The burden of proof is upon him who asserts the master's negligence as the foundation of his claim. Benedict v. Scheider (Com. Pl. N. Y.) 14 N. Y. Supp. 888. And, as plaintiff failed to sustain such burden as to a most essential feature of his claim for damages arising out of defendants' alleged negligence, it was error to submit the question of defendants' negligence to the jury, and to deny defendants' motion for a dismissal of the complaint, made when plaintiff rested, and renewed upon the close of the entire case.

There is another reason why the plaintiff should have been nonsuited, and this is furnished by plaintiff's own evidence, which clearly shows that he assumed an obvious danger,—one clearly accepted by him as among the risks of his employment. Plaintiff testified that the manner in which the side tier had been piled was unsafe, and that it would not stand without support; and yet, notwithstanding this, he caused the goatskins which supported it to be removed. These circumstances, considered in connection with the testimony of said Clarke: "There is nothing out of the common in stowing in the side tiers. I worked sometimes in a storage warehouse, and am always on the lookout to see that bales don't fall upon me when I work there. If you want to keep yourself safe, you look out ahead of you. You don't want to get yourself in a hole. To look out to see, in moving bales, you don't get hurt. That is quite a common thing,"—show conclusively that plaintiff accepted and continued in a service necessarily hazardous, and with knowledge of the character of the work from which injury might be apprehended; and hence it must be held that he assumed the usual risks and perils of the service, and also those risks which were apparent to ordinary observation. Gibson v. Railway Co., 63 N. Y. 449; Benedict v. Scheider, supra; Davidson v. Cornell, 132 N. Y. 243, 30 N. E. 573. For these reasons the judgment should be reversed, and a new trial ordered, with costs to abide the event. All concur.